UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

DESIREE DELPIT, ET. AL                           CIVIL ACTION

VERSUS
                                                 NO. 16-00026-JWD-EWD
BATON ROUGE CITY POLICE, DIST. 2,
ET AL.

## RULING

Before the Court is a *Motion for Summary Judgment* ("Motion") filed by the City of

Baton Rouge/Parish of East Baton Rouge ("City"), Lieutenant Donald Kelly ("Kelly"),

Lieutenant Stephen Chenevert ("Chenevert"), Corporal Chase Ard ("Ard"), Officer Josh

Kirst ("Kirst"), Officer Josh Gillich ("Gillich"), Officer Brandon Blackwell ("Blackwell"),

Officer Geoffrey Wilkes ("Wilkes"), Officer Jory Guidry ("Guidry"), Officer Kent Hagge

("Hagge"), and Officer Peggy Hardy ("Hardy") (collectively referred to as "Defendants").[1]

Plaintiff Dexter Delpit ("Plaintiff" or "Dexter") has filed a *Response in Opposing to*

*Defendants/Counsel Motion for Summary Judgment* ("Opposition") to which the

Defendants have filed a *Reply*.[2]  The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331,

1343.  Oral argument is unnecessary.  For the following reasons, the *Motion* shall be

**GRANTED IN PART** and **DEFERRED IN PART**.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

The facts taken in the light most favorable to Plaintiff are as follows.

---

[1] Doc. 81.  Defendants have also filed a Motion for Summary Judgment seeking dismissal of the claims asserted by Desiree Delpit (Doc. 80).  The Court will deal with that Motion in a separate ruling.
[2] Doc. 96 and Doc. 101.

## A. *Events Leading Police to Plaintiff's Residence*

On January 16, 2015, Baton Rouge Police Officers Blackwell, Gillich, Guidry, Hagge, Kirst, and Wilkes proceeded to Plaintiff's home in response to a report of aggravated assault with a knife.[3]  Earlier that day, Plaintiff's sister Dazmin Granger ("Granger") went to the Baton Rouge 2nd District Precinct Police Station and reported to Blackwell that she had been assaulted by Dexter while standing outside her mother's residence.[4]  According to Granger, Dexter grabbed her phone and threw it to the ground after she refused his command to go inside the house.[5]  Granger told Blackwell that Dexter threatened to kill her by getting a knife from inside the house and placing it against her throat.[6]  Granger was accompanied by her sister, Dymon Delpit ("Dymon"), who also informed Blackwell that she too had been a victim of past verbal and physical abuse from both Dexter and his mother, Desiree Delpit ("Desiree").[7]

Blackwell attested to the fact that he found both Granger and Dymon to be of sound mind and that, based upon their statements, he believed that he had probable cause to arrest Dexter for aggravated assault.[8]  After running Dexter's name through a criminal history database, Blackwell learned that Dexter had multiple prior arrests in recent years, several of which were for charges that were violent in nature.[9]  These arrests included: (1) Criminal Damage to Property in 2007; (2) Aggravated Burglary, Forcible Rape, Illegal Carrying of Weapons, and Driving While Intoxicated ("DWI") in 2008; (3) DWI, Resisting

---

[3] Doc. 81-4 at 1; Doc. 81-5 at 1; Doc. 81-6 at 1; Doc. 81-7 at 1; Doc. 81-8 at 1; Doc. 81-9 at 1; Doc. 81-10 at 1.
[4] Doc. 81-14 at 4.
[5] Doc. 81-14 at 2-7; Doc. 81-4 at 1.
[6] *Id.*
[7] Doc. 81-15 at 9, 15; Doc. 81-4 at 2.
[8] Doc. 81-4 at 2.
[9] *Id.*

an Officer, Battery of an Officer, Criminal Damage to Property in 2010; (4) Possession of Schedule I Drugs, Illegal Use of Weapons, Illegal Carrying of a Weapon, and Drug Paraphernalia in 2011; (5) Disturbing the Peace and Resisting an Officer in 2012; and, (6) Armed Robbery and First Degree Murder, also in 2012.[10]

Blackwell further stated that he determined that, in order to prevent physical harm to Granger, Dexter's immediate arrest was required.[11] Blackwell based his determination on several factors, including Dexter's extensive previous arrest record, the fact that Granger was living at her mother's residence with Dexter at the time of the events in question, and the violent nature of the alleged crime.[12] Blackwell also indicated that he also requested the assistance of additional officers in order to peaceably effect Dexter's arrest in light of the aforementioned circumstances.[13]

### B. *Officers' First Interaction with Plaintiff – Handcuffing Dexter*

Baton Rouge Police Officers Blackwell, Gillich, Guidry, Hagge, Kirst, and Wilkes arrived at Plaintiff's residence later that evening sometime after 9:00 p.m.[14] Gillich concedes to making the initial contact by knocking on the Plaintiff's front door.[15] According to his sworn affidavit, Gillich stated that when Desiree opened the front door, he was immediately able to see Dexter in the living room, moving toward the front door and stopping at the threshold of the doorway.[16]

---

[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] Doc. 81-5 at 1; Doc. 81-16 at 2.
[16] Doc. 81-5 at 1.

Gillich attested to ordering Dexter to turn around with his hands behind his back and proceed outside of the residence.[17]  Gillich stated that he took hold of Dexter once Dexter began to back away from the front door in what Gillich identified as an attempt not to be seized.[18]  Gillich admitted that, while attempting to seize Dexter, he eventually pinned him upright against the wall on the front porch.[19]  According to Gillich, Dexter subsequently began actively resisting by pushing off of him and pulling his arm away.[20] Gillich stated that because of Dexter's resistance, he pushed him up against the wall again in order to gain control of Dexter.[21]  Blackwell, who had been observing Gillich's attempt to seize Dexter, intervened and proceeded to assist by holding Dexter's head against the wall of the residence.[22]

While Gillich and Blackwell were attempting to restrain Dexter on the front porch, Desiree proceeded to step out of the front door in an attempt to question the officers' actions.[23]  Blackwell stated that because they were in the middle of an altercation with Dexter, and because Desiree was reacting in an emotional and angry manner, he ordered her to go back inside the house.[24]  Desiree ignored Blackwell's order and continued to try to intercede in the officers' attempt to seize Dexter.[25]  Desiree aggressively questioned the officers' actions while in close proximity to them.[26]  Blackwell admits that he then pushed Desiree inside the residence and closed the door.[27]

---

[17] *Id.*
[18] Doc. 81-5 at 2.
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] Doc. 81-4 at 2.
[23] Doc. 81-16 at 3-5; Doc. 80-4 at 2.
[24] Doc. 81-4 at 2.
[25] *Id.* at 3.
[26] *Id.*
[27] *Id.*

Because Dexter continued to resist any attempt to peacefully arrest him, Gillich claims that he was forced to initiate a take-down maneuver in an attempt to control Dexter and place him in handcuffs.[28]  Guidry, who was initially positioned at the back of the residence, proceeded to the front porch where he observed Gillich and Blackwell attempting to restrain Dexter.  According to his sworn affidavit, Guidry observed Dexter actively resisting arrest by pulling his hands away and trying to move while he was on the ground.[29]  At this point, Guidry attempted to assist Gillich and Blackwell by cradling Dexter's head to prevent it from moving and protecting it from injury.  With Guidry's assistance, the officers were able to place handcuffs on Dexter while he was on the front porch.  Once Dexter was restrained in handcuffs, Gillich and Blackwell began to escort him to Blackwell's police vehicle.

## C.  *Second Interaction with Plaintiff – Escorting Dexter to Police Vehicle*

After Dexter was handcuffed Gillich and Blackwell picked him up and proceeded to escort him from the front porch to Blackewell's police unit.[30]  In his Opposition, Dexter contends that he was violently thrown off of the front porch by an unidentified officer.[31] According to Blackwell and Kirst's sworn affidavits, as well as Dymon's sworn testimony, Dexter began screaming at the officers in a hostile manner and pulling away from the officers as he was being escorted to the police vehicle.[32]  Blackwell attested to using "minimal force to guide and assist Dexter to walk forward towards the police unit."[33] Dymon testified that she witnessed Dexter exiting the house in handcuffs, but when asked

---

[28] Doc. 81-5 at 2.
[29] *Id.*
[30] *Id.*; Doc.81-4 at 2.
[31] Doc. 96 at 2.
[32] Doc. 81-4 at 2; Doc. 81-7 at 1; Doc. 81-15 at 7.
[33] Doc. 81-4 at 3.

during her deposition whether she saw Dexter being thrown down any porch stairs, Dymon testified that "we have stairs, but I didn't witness him falling down the stairs."[34]

Blackwell states that Dexter "would not willingly enter the police vehicle and attempted to prevent the officers from placing him in the vehicle by pushing back...."[35] Blackwell further asserts that the officers were required to use minimal force to place Dexter in the back of the police unit.[36] Dymon testified that she witnessed Dexter resisting the officers by jerking away from them, making remarks, and screaming.[37] She stated that "it was difficult for the officers to get him in the car."[38] In his Opposition, however, Dexter contends that he was pinned and his head was violently slammed against the trunk of the vehicle.[39] Dexter further asserts that his eyes were being gouged out as the officers proceeded to search his person while he was handcuffed and that he was in fear for his life.[40]

**D.** ***Third Interaction with Plaintiff – Inside the Vehicle En Route to Police Station***

Plaintiff alleges that shortly after he was secured in the police vehicle and while he was being transported to the police station, the vehicle stopped and unidentified officers entered from both sides and "repeatedly punched [Dexter] in his head and face as they held him down while [he] was still in handcuffs."[41] Blackwell admits that he pulled the vehicle over while he was transporting Dexter to the Second District Precinct, but states

---

[34] Doc. 81-15 at 15-16.
[35] Doc. 81-4 at 3.
[36] *Id.*
[37] Doc. 81-15 at 16.
[38] *Id.* at 17.
[39] Doc. 96 at 2.
[40] *Id.*
[41] Doc. 96 at 3.

this was only done so that "additional restraints [could be] placed on Dexter."[42]  None of the other officers indicated in their testimony or affidavits that they assisted Blackwell in placing additional restraints on Dexter.

### E.  *Fourth Interaction with Plaintiff – Inside the Police Station*

After the additional restraints were placed on Dexter, he was then taken to the Second District Police Precinct and charged with Aggravated Assault, Battery of a Police Officer, Resisting an Officer with Force or Violence, Simple Battery, Threatening a Public Official, and Public Intimidation.[43]  Dexter contends that once the officers took him inside of the police station, unidentified officers "brought [him] to the ground and falling [sic] on top of him with the willful intent of excessive force."[44]  Plaintiff further alleges that he was then "picked up by his hands and feet while being handcuffed."[45]

### F.  *Procedural History*

On January 13, 2016, Plaintiff, along with his mother Desiree, filed this *pro se* action against Defendants seeking damages under 42 U.S.C. § 1983 for false arrest and use of excessive force in violation of the Fourth and Fourteenth Amendments of the United States Constitution and other provisions of Louisiana state law.[46]  While the specific causes of action do not specify which claims are brought under which capacities, in the absence of any evidence to the contrary, the Court, in deciding this Motion for

---

[42] Doc. 81-4 at 3.
[43] *Id.*
[44] Doc. 96 at 3.
[45] *Id.*
[46] Doc. 1.

Summary Judgment, presumes that the causes of action against the named Defendants in the Complaint are brought in both their individual and official capacities.[47]

## II. Discussion

### A. Rule 56 Legal Standard

Rule 56 sets forth the standard applicable to the Motion. Per Rule 56(a), summary judgment is generally appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[48] A dispute is "genuine" so long as "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"; a fact is "material" if it "might affect the outcome of the suit under the governing law."[49]

Axiomatically, a court construes all facts and evidence in the light most favorable to the nonmovant.[50] In response to another's motion, the nonmovant cannot rely on "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments."[51] While the court will "apply less stringent standards to parties proceeding *pro se* than to parties represented by counsel,"[52] the "evidentiary requirements of summary judgment apply equally to *pro se* litigants as they do to represented parties."[53] Thus, in the Fifth Circuit, *pro se* litigants may not oppose summary judgments by the use of unsworn materials."[54]

---

[47] *Senu-Oke v. Jackson State Univ.*, 521 F.Supp.2d 551, 556 (S.D.Miss.2007) (holding "[i]n the Fifth Circuit…if it is not clear from the allegations of the complaint whether a defendant has been sued in his official or individual capacity, the court must look to the substance of the claims, the relief sought, and the course of the proceedings to determine in which capacity the defendant is sued.").

[48] Fed. R. Civ. P. 56(a); *Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015) (quoting Rule 56(a)).

[49] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); see also *Ray v. United Parcel Serv.*, 587 Fed.Appx. 182, 186 (5th Cir. 2013) (citing *id.*).

[50] *Haverda v. Hays Cnty.*, 723 F.3d 586, 591 (5th Cir. 2013).

[51] *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002).

[52] *Grant v. Cuellar*, 59 F.3d 523, 524 (5th Cir. 1995) (per curiam).

[53] *Jackson v. State Farm Fire & Casualty Co.*, 2010 WL 724108 (E.D. La. February 22, 2010).

[54] *Gordon v. Watson*, 622 F.2d 120, 123 (5th Cir. 1980).

Still, "[w]hen both parties have submitted evidence of contradictory facts,"[55] a court is bound to "draw all reasonable inferences in favor of the nonmoving party" and cannot "make credibility determinations or weigh the evidence."[56] Thus, this Court must "give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses."[57] To wit, although this Court "should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."[58] Within the narrow ambit of Rule 56, summary judgment is hence inappropriate (1) if there are legitimate, not superficial or frivolous, factual disputes that may affect the outcome of the case under the applicable substantive law,[59] and (2) if the nonmovant relies exclusively on "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "a scintilla of evidence."[60]

## B. Parties' Arguments

Defendants argue that the Court should grant summary judgment in their favor because Plaintiff's § 1983 claims are barred from recovery under the doctrine of qualified immunity.[61] Defendants further argue that Plaintiff's claim against the Baton Rouge Second District Police Department should be dismissed because it is not a legal entity

---

[55] *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).

[56] *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105 (2000); *see also Anderson*, 477 U.S. at 248 (emphasizing the irrelevance of "[a]ny proof or evidentiary requirements imposed by the substantive law," materiality "not a criterion for evaluating the evidentiary underpinning of [factual disputes]").

[57] 9A C.Wright & A. Miller, Federal Practice and Procedure § 2529 (2d. ed. 1995).

[58] *Reeves*, 530 U.S. at 151, 120 S. Ct. at 2110, *cited in Havera*, 723 F.3d at 591.

[59] *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

[60] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (internal quotation marks omitted) (citing, among others, *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986); *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed. 2d 695 (1990); *Hopper v. Frank*, 16 F.3d 92, 94-95 (5th Cir. 1994); and *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1086 (5th Cir. 1994)).

[61] Doc. 81-1.

capable of being sued, or alternatively, because Plaintiff has failed to establish the requisite failure to train or supervise claim, necessary to recover money damages when a deprivation of a federally protected right is caused by an action taken pursuant to an official municipal policy.[62]

In his Opposition to Defendants' Motion, Plaintiff restates many of the facts giving rise to the events in question and reasserts his claims against the Defendant Officers as well as the City of Baton Rouge for excessive force, false arrest, and state law claims of Intentional Infliction of Emotional Distress.[63] Plaintiff also seeks relief in the form of disciplinary action and/or charges filed against Defendants.[64]

### C. Analysis and Application

### I. Excessive Force Claims

The primary (but not only) issue raised in Defendants' Motion for Summary Judgment is whether or not Blackwell, Guidry, Kirst, and Gillich are entitled to qualified immunity for their physical interactions with Dexter during the course of his arrest. All four officers admit to making physical contact with Plaintiff, albeit at different times during the interaction and at different locations. The Court will examine each of the four instances where the officers used physical force against Dexter.

### a. Qualified Immunity Standard

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[65] "The Supreme Court has

---

[62] *Id.* at 14.
[63] Doc. 96 at 1-3.
[64] *Id.* at 4-6.
[65] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

characterized the doctrine as protecting 'all but the plainly incompetent or those who knowingly violate the law.'"[66]

Courts are instructed to apply "a two-step analysis to determine whether a defendant is entitled to summary judgment on the basis of qualified immunity."[67] First, the court must "determine whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights."[68] If the court determines that the plaintiff's constitutional rights were violated, it must next consider "whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question."[69] Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."[70] At the heart of this inquiry is "whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law."[71] The court "must evaluate an officer's use of force 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"[72]

---

[66] *Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273, 284 (5th Cir. 2002) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

[67] *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007).

[68] *Id.*

[69] *Id.* at 411.

[70] *See Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

[71] *Glenn v. City of Tyler*, 242 F.3d 307, 312 (5th Cir. 2001) (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)).

[72] *Poole v. City of Shreveport*, 691 F.3d 624, 627-28 (5th Cir. 2012) (quoting *Graham,* 490 U.S. at 396).

The Court must "make two 'overlapping objective reasonableness inquiries'" when analyzing a claim of qualified immunity in excessive force cases.[73] According to the Fifth Circuit:

> Allegations that an officer used excessive force in conducting a seizure complicates the *Saucier* inquiry. This complexity stems from having to make two overlapping objective reasonableness inquir[ies]. We must first answer the constitutional violation question by determining whether the officer's conduct met the Fourth Amendment's reasonableness requirement…If we find that the officer's conduct was not reasonable under the Fourth Amendment, we must then answer the qualified immunity question by determining whether the law was sufficiently clear that a reasonable officer would have known that his conduct violated the constitution. In other words, at this second step, we must ask the somewhat convoluted question of whether the law lacked such clarity that it would be reasonable for an officer to erroneously believe that his conduct was reasonable. Despite any seeming similarity between these two questions, they are distinct inquiries under *Saucier*, and we must conduct them both.[74]

When a qualified immunity defense is invoked, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense.[75] In countering a motion for summary judgment, "the plaintiff can no longer rest on the pleadings…and the court looks to the evidence before it (in the light most favorable to the plaintiff) when conducting the [qualified immunity] inquiry."[76] Although the court is to view all facts in a light most favorable to plaintiffs, the burden remains on plaintiffs "to negate the [qualified immunity] defense once properly raised."[77]

---

[73] *Sanchez v. Fraley*, No. 09-50821, 2010 WL 1752123, at *2 (5th Cir. Apr. 30, 2010) (unpublished) (quoting *Lytle v. Bexar County, Tex.*, 560 F.3d 404, 409-10 (5th Cir. 2009)).

[74] *Lytle*, 560 F.3d at 410.

[75] *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (citing *Bazan ex. rel. Bazan v. Hidalgo Cnty*, 246 F.3d 481, 489 (5th Cir. 2001)).

[76] *Id.* at 323 (quoting *Behrens v. Pelletier*, 516 U.S. 299, 309, 116 S. Ct. 834, 133 L. Ed. 2d 773 (1996)) (omission in original).

[77] *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012) (quoting *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008)).

### b. Whether the Officers' Conduct Violated the Fourth Amendment

The Fourth Amendment of the United States Constitution guarantees citizens the right from unreasonable searches and seizures.[78] In order to determine whether the officers' conduct violated Plaintiff's Fourth Amendment rights by using excessive force, Plaintiff must establish that he suffered "(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable."[79] "Assessing the reasonableness of a police officer's use of force involves 'a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interest at stake.'"[80] Courts within the Fifth Circuit have considered several factors when assessing the reasonableness of the use of force, including: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest."[81] "[W]e must balance the amount of force used against the need for force," paying "careful attention to the facts and circumstances of each particular case."[82]

The Supreme Court has made clear that an objective standard of analysis—one that does not take into account subjective intent—is used when evaluating an officer's actions.[83] The Court has also held that a government officer's actions are entitled to deference:

---

[78] U.S. Const. Amend. IV.

[79] *Ballard v. Burton*, 444 F.3d 391, 402 (5th Cir. 2006) (citing *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004)).

[80] *Lytle*, 560 F.3d at 411 (quoting *Graham*, 490 U.S. at 396) (internal quotation omitted).

[81] *Hill v. Carroll County, Miss.*, 587 F.3d 230, 234 (5th Cir. 2009) (citing *Graham*, 490 U.S. at 396).

[82] *Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir. 2008) (quoting *Flores*, 381 F.3d at 399) (internal quotation marks and citations omitted).

[83] *Graham*, 490 U.S. at 397.

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight…The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation.[84]

### i.  Plaintiff's First Excessive Force Claim: Front Porch of Residence

Turning to the facts of this case, it is evident that each of the officers knew that they were responding to a potentially dangerous crime scene where the suspect was reported to have attacked his sister with a deadly weapon earlier that same day.  The mere fact that they were part of a team of six officers responding to the scene is another indication of the Defendants' objective belief of the threat that the suspect posed to their safety.  The evidence also shows that Plaintiff failed to comply with Gillich's initial instructions ordering Dexter to turn around and proceed outside of the residence with his arms behind his back. Gillich's sworn testimony detailing Dexter's resistance[85] is corroborated by Blackwell's first-hand observations stated in his sworn affidavit.[86]

The record also demonstrates that Blackwell's involvement in the initial physical altercation between Dexter and Gillich on the front porch of the residence (i.e. holding Dexter's head against the wall of the residence) was prompted by Plaintiff's initial resistance to Gillich's attempt to place him under arrest.

Dexter also contends that during this initial altercation, the officers forcefully slammed him into a window of the residence.[87]  Gillich admits to using a "take down

---

[84] *Id.*
[85] See Doc. 81-5 at 2.
[86] Doc. 81-4 at 2.
[87] *Id.*

maneuver" in an attempt to subdue Dexter and place him in handcuffs.[88]  Gillich's account of Dexter's resistance is further corroborated by Guidry, who claims to have proceeded to the front porch as Gillich was using his take down maneuver in an attempt to restrain Dexter.[89]  Guidry further claims that Dexter continued to resist while on the ground, causing Guidry to intervene in an attempt to assist Gillich and Blackwell place handcuffs on Plaintiff.[90]  It is significant that Plaintiff's Opposition does not challenge Defendants' account of Dexter's resistance to Gillich, Blackwell, and Guidry's attempts to restrain Plaintiff on the front porch of his mother's house.  Instead, Plaintiff makes only unsupported conclusory arguments that Defendants are "covering up corruption and making fraudulent statements under oath."[91]

Viewed from the perspective of a reasonable officer on the scene, Plaintiff has failed to carry his burden of showing that the officers' actions were objectively unreasonable.  The threat posed by Plaintiff's resistance presented an immediate risk of serious harm to Gillich, Blackwell, Guidry, and others.  Reasonable officers in this situation could well have had reason to believe that Plaintiff may have been armed based on the nature of the underlying complaint, and the Plaintiff's previous history of altercations with police officers.

Additionally, Fifth Circuit jurisprudence has consistently recognized that an officer's use of takedown maneuvers to subdue a resistant suspect during the course of an arrest is not necessarily constitutionally unreasonable.  In *Griggs v. Brewer*, a drunken

---

[88] Doc. 81-1 at 6; Doc. 81-5 at 2.
[89] Doc. 81-1 at 6; Doc. 81-6 at 1.
[90] *Id.*
[91] Doc. 96 at 2. (see *TIG Ins. Co.*, 276 F.3d at 759) (holding that the nonmovant cannot rely on "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments").

driving suspect claimed that the arresting officer's use of a takedown maneuver in which the suspect was placed in a chokehold and slammed facedown into the ground with the officer landing on top of him was unconstitutionally excessive.[92]  The *Griggs* court held that, in light of Fifth Circuit precedent, such takedown maneuvers were not constitutionally unreasonable.  The court explained that while the officer's "actions may not have been as restrained as we would like to expect from model police conduct" qualified immunity "protects 'officer[s] from the sometimes hazy border between excessive and acceptable force.'"[93]

The Court finds that Dexter has failed to carry his burden of showing the actions of these three officers (Gillich, Blackwell, and Guidry) were objectively unreasonable given the perceived failure of Dexter to comply with their initial instructions, and his active resistance to their attempts to restrain him.  Accordingly, the Defendants' Motion shall be **GRANTED** with respect to Plaintiff's excessive force claims against Gillich, Blackwell, and Guidry relating to their initial attempt to restrain Dexter on the front porch of his mother's residence.

### ii.    Plaintiff's Second Excessive Force Claim: Front Lawn of Residence

Plaintiff alleges that Blackwell, Gillich, and Kirst used excessive force after he was restrained in handcuffs while being escorted to the police vehicle.  Specifically, Plaintiff claims that he was violently thrown off the front porch, and that unidentified officers slammed his head against the trunk of the police vehicle and applied pressure points to

---

[92] *Griggs*, 841 F.3d 308, 311 (5th Cir. 2016).
[93] *Id.* (quoting *Saucier*, 533 U.S. 194, 206, 121 S. Ct. 2151, 150 L. Ed. 2d, 272 (2001) (citations and quotations omitted).  *See also Arshad ex. rel. Arshad v. Congemi*, 08-30061, 2009 WL 585633, *7 (5th Cir. Mar. 9, 2009) (officer's takedown maneuver asserted against a suspect who repeatedly refused to comply with officer's attempt to arrest was not objectively unreasonable); *see also Cardinal v. Allain*, CV-05-107-JJB, 2007 WL 3256447, at 4 (M.D. La. Nov. 5, 2007) (takedown maneuver used against a plaintiff who resisted arrest by jerking away from officer and pushing officer was reasonable).

the back of his head.[94]  Plaintiff further asserts that he was "in fear of death" and handcuffed throughout the entire incident.[95]  Defendants contend that while they attempted to escort Dexter to the police vehicle, he continued to resist by screaming at them in a hostile manner and refusing to willingly proceed to the vehicle by constantly pulling away.[96]  The Defendants further assert that they were required to use "minimal force to guide and walk Dexter forward towards the police unit," and that once at the vehicle, Dexter refused to enter the vehicle by pushing back and/or standing still in front of the driver-side back door.[97]

The Court finds that even if the allegations made by Plaintiff are taken as true, the use of such force under the circumstances, when viewed from the perspective of a reasonable officer on the scene, is not objectively unreasonable in light of the circumstances.  The Court further notes that in his Opposition, Dexter does not deny that he continued to resist while handcuffed.[98]

The officers' claims that Dexter continued to resist as he was being escorted to the police vehicle are supported by the police report narratives provided by various officers at the scene, as well as Dymon's sworn testimony as a witness to the incident.[99]  Additionally, the record demonstrates that a small, agitated crowd of neighbors began to gather in close proximity to the officers as Dexter was being escorted to the police vehicle, adding another safety concern as Blackwell, Gillich, and Kirst attempted to place Dexter in the police vehicle.[100]  Dexter's mother Desiree concedes that she ignored the officers'

---

[94] Doc. 96 at 2.
[95] *Id.*
[96] Doc. 81-3 at 7.
[97] *Id.*
[98] Doc. 96.
[99] Doc. 96-1 at 6, 10; Doc. 81-15 at 8-9.
[100] Doc. 96-1 at 6, 10.

commands to stay inside the residence, and angrily followed the officers as they escorted Dexter to the police vehicle, repeatedly interfering with Dexter's arrest.[101]

In light of these circumstances, including Dexter's resistance, the angry crowd that began to gather on the front lawn, Desiree's interference, and the events which preceded this, the Court finds that, again, Dexter has failed to meet his burden to overcome the asserted defense of qualified immunity.  Each factor could well have presented a legitimate concern to a reasonable officer attempting to restrain a dangerous suspect and presented an immediate danger to the safety of all who were present.  For reasons similar to the Plaintiff's excessive force claim above, the Court finds that Plaintiff's claim is barred by qualified immunity.  Accordingly, the Defendants' Motion is **GRANTED** with respect to Dexter's claims asserted against Blackwell, Gillich, and Kirst as they relate to their physical interactions with Dexter on the front lawn of the residence.

### iii.    Plaintiff's Third Excessive Force Claim: Inside Blackwell's Police Vehicle

Plaintiff alleges that while he was secured inside Blackwell's police vehicle and headed to the police station, the officers stopped "the unit on the way to 2nd District, [and] enter[ed] from both sides [and] repeatedly punched Mr. Delpit in the head and face as they held him down, while still in handcuffs…"[102]   Defendants admit that Blackwell stopped the vehicle while proceeding to the station; however, their account of this incident differs significantly from Plaintiff's version of events.  According to the narrative provided by Blackwell in the police report:

> While en route to 2nd District, Dexter still bounced around the back of the car making threats towards Officers and then attempting to kick his feet around.  Officer [Blackwell] cut through a parking lot in an attempt to get him

---

[101] Doc. 81-16 at 6-7.
[102] Doc. 96 at 3.

to the District quicker but had to quickly stop the unit to restrain him. Officers entered from both sides of the back seat and into the car holding him down while another Officer ran to get leg shackles. Once Officers were able to place leg shackles on Dexter, Officer [Blackwell] quickly continued [his] journey to 2nd District.[103]

Significantly, in his Opposition, Plaintiff does not deny that he was being disruptive while in the backseat of the police vehicle.[104] Additionally, a video recording appears to refute Dexter's allegation that the officers punched him repeatedly in the head when the vehicle stopped along the way to the station.[105] Video evidence is afforded great weight when determining fact issues at the summary judgment stage. As the Fifth Circuit has held:

Although we review evidence in the light most favorable to the nonmoving party, we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene. A court…need not rely on the plaintiff's description of the facts where the record discredits that description but should instead consider 'the facts in the light depicted by the videotape.[106]

Based on the video recording submitted in support of the Defendants' Motion, the Court is inclined to grant summary judgment on this claim. However, because it is unclear from the record when the video was actually provided to the Plaintiff (i.e., whether the video was provided to Plaintiff before he filed his Opposition), the Court shall give the Plaintiff ten (10) days to supplement his Opposition to address the content of the video solely on this particular claim. Accordingly, the Court shall defer ruling on whether the Defendants are entitled to qualified immunity with respect to Plaintiff's excessive force claims against Blackwell and the unidentified officer regarding their alleged use of excessive force against Dexter while inside of the police vehicle.

---

[103] Doc. 96-1 at 7.
[104] Doc. 96.
[105] Doc. 81-18, Digital Video Recorder (DVR) P1320 of Joshua Gillich, start time 2015-01-16 21:17:52, beginning 21:30:50-21:33:27.
[106] *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 381, 127 S. Ct. 1769 L.Ed.2d 686 (2007)).

### iv.    Plaintiff's Fourth Excessive Force Claim: Inside Police Station

Plaintiff's final excessive force claim against Defendants allegedly occurred once the officers transported Dexter inside the police station.  According to Plaintiff, "once inside of the 2nd District, officers brought Mr. Delpit to the ground and falling on top of him with the willful intent of excessive force."[107]  Defendants do not dispute bringing Dexter to the ground and falling on top of him, however, they counter that it was necessary due to Dexter's continued resistance of "locking his legs out against the bench so that he couldn't be set down," once he was placed inside of the holding cell.[108] Defendants further assert that once they were able to get Dexter situated, they picked him up by his hands and feet and placed him on the bench where he was then handcuffed to the bar.[109]

Defendants' account of Dexter's continued resistance after being transported from Blackwell's police vehicle into the 2nd District Police Precinct is supported by the narrative provided on the filed police report.[110]  Additionally, the Plaintiff does not dispute the claims of his resistance in his Opposition.  Because the evidence demonstrates that Dexter was actively resisting the officers' attempts to secure him in his holding cell, the Court finds that the force used against Dexter while inside of the police station was reasonable and not in violation of the Fourth Amendment.  Accordingly, the Defendants' Motion shall be **GRANTED** with respect to Plaintiff's claim regarding the Defendants' use of force against Dexter while inside the police station.

---

[107] Doc. 96 at 3.
[108] Doc. 91-1 at 7.
[109] *Id.*
[110] Doc. 96-1 at 5.

### c. Whether the Law Was Sufficiently Clear That A Reasonable Officer Would Have Known that Pushing Plaintiff Violated the Constitution

Because the Court has deferred ruling on Plaintiff's third excessive force claim, the following analysis shall only apply to Plaintiff's first, second, and fourth excessive force claims.

The Defendants argue that even if their conduct violated the Fourth Amendment, reasonable officers in their positions would not have known that using this type of force was unlawful in light of clearly established law. The Court agrees and finds that Supreme Court and Fifth Circuit jurisprudence has clearly recognized the need for officers to use reasonable force to subdue and handcuff resisting suspects.

The Supreme Court has held that a suspect's active resistance is a key factor in the Fourth Amendment's "objective reasonableness" test.[111] The Fifth Circuit has applied this holding in several cases in the context of justifying the use of "take down maneuvers" by police officers who had reason to believe that a resisting suspect posed a threat to their safety. For example, in *Poole v. City of Shreveport*, the court found that an officer who used such force against a suspect who "refused to turn around and be handcuffed…posed an 'immediate threat,'" was reasonable and did not contravene the Fourth Amendment.[112]

Like the suspect husband in *Poole*, when ordered to exit the residence by Gillich, Dexter instead backed away from him. The record also shows that Dexter continued to resist being placed in the police vehicle while he was being escorted by the officers.[113]

---

[111] *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).
[112] *Poole*, 691 F.3d 624, 629 (5th Cir. 2012) (quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam)).
[113] Doc. 81-5 at 2.

As previously discussed, Plaintiff does not dispute that he was being disruptive by kicking his feet around the backseat while en route to the police station. Finally, Plaintiff does not dispute that he was actively resisting being placed in the jail cell once he arrived at the police station. For these reasons, the Court finds that it would not have been clear to a reasonable officer that using such force in light of the particular circumstances of this case, which involved the arrest of a dangerous suspect, would have violated the Fourth Amendment. Accordingly, Blackwell, Gillich, Guidry, and Kirst are entitled to qualified immunity and summary judgment as to the Plaintiff's first, second, and fourth claims of excessive force; therefore the Defendants' Motion shall be **GRANTED** as to these excessive force claims.

## II. Remaining Claims

### A. Plaintiff's Claims Against Remaining Officers

Plaintiff alleges excessive force claims not only against Blackwell, Gillich, Kirst, and Guidry, but also against all officers named as Defendants in this lawsuit. The undisputed record evidence shows that Kelly, Hardy, Chenevert, and Ard were not present at the scene of the incident in question and had no physical contact with Dexter.[114] Additionally, while Hagee and Wilkes were present at the scene of the incident, the record indicates that neither of these officers had any physical contact with Plaintiff.[115] Accordingly, the Court finds that Plaintiff's Section 1983 claims of excessive force against Kelly, Hardy, Chenevert, Ard, Hagee, and Wilkes are without merit and are hereby dismissed.

---

[114] Doc. 81-1 at 9; Doc. 81-8 at 1; Doc. 81-11 at 1; Doc. 81-12 at 1; Doc. 81-13 at 1.
[115] Doc. 81-1 at 9; Doc. 81-9 at 1; Doc. 81-10 at 1.

## B. Plaintiff's Section 1983 Claims Against the City/Parish

Defendants contend that the Second District Police Department is not a legal entity capable of being sued and, thus Plaintiff's claims against this Defendant should be dismissed. The Court agrees and dismisses Plaintiff's claims against it. Moreover, even if Plaintiff had named a proper political subdivision or supervisory official as a defendant, Plaintiff has produced no facts establishing a failure to train or supervise by a municipality under Section 1983.[116] Accordingly, Plaintiff's Section 1983 claims against the City and/or Parish shall be dismissed and Defendants' Motion is **GRANTED**.

## C. Plaintiffs' False Arrest Claim

Dexter asserts a claim of false arrest against Defendants.[117] Dexter makes the conclusory allegation that "[a]ll of the charges the police wrote up on Dexter Delpit are false charges. It's a crime to falsely accuse someone of crime that they didn't commit."[118]

Louisiana state law recognizes the torts of false arrest and false imprisonment.[119] In order for a plaintiff to recover for false arrest, he or she must prove two elements: (1) detention of a person, and (2) unlawfulness of the detention.[120] "If police officers act pursuant to statutory authority when they arrest and incarcerate a citizen, they are not liable [for] damages for false arrest and imprisonment. As long as the officers reasonably

---

[116] See *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986) (holding that a municipality may not be held liable under Section 1983 where no constitutional depravation has occurred); *Elizondo v. Green*, 671 F.3d 506- 510-11 (5th Cir. 2012); *Foster v. Carroll Cnty.*, No. 11-60726, 2012 WL 5398190, at *2 (5th Cir. Nov. 6, 2012) (unpublished); *see also Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 426 (5th Cir. 2006) ("We have held that we 'use the same standard in assessing an individual supervisor's liability under Section 1983 as that used in assessing a municipality's liability' thereunder.") (quoting *Doe v. Taylor ISD*, 15 F.3d 443, 453 (5th Cir. 1994) (en banc)).
[117] Doc. 1.
[118] Doc. 96 at 3.
[119] *Alvarado v. Poche*, 2002-2 (La.App.3d Cir. 6/5/02), 819 So.2d 1150, 1152, writ den., 2002-2212 (La. 11/8/02), 828 So.2d 1120.
[120] *Dumas v. City of New Orleans*, 2001-0448 (La.App. 4th Cir. 1992), writ den., 595 So.2d 658 (La.1992).

believed the statute upon which they relied was valid at the time they acted, the law exempts the officers from liability even if the statute should later be declared unconstitutional."[121]

Here, it is undisputed that Dexter was initially arrested pursuant to a charge of Aggravated Assault.  It is further undisputed that the charge was based on a report by Granger to Blackwell that Dexter held a knife to her throat and threatened to kill her. Granger's accusation was corroborated by Dymon's statements to Blackwell.  Blackwell testified that he found Granger and Dymon to be credible and concluded that Dexter presented an imminent danger to Granger, particularly in light of his prior criminal history. Based on the foregoing reasons, the Court finds that Blackwell had probable cause to immediately arrest Dexter for Aggravated Assault.  Accordingly, Defendants' Motion is **GRANTED** and any of Plaintiff's state law claims related to false arrest or false imprisonment are hereby dismissed.

### D. Plaintiff's Relief In The Form of Disciplinary Action and/or Criminal Charges

Plaintiff seeks relief in the form of disciplinary action and/or criminal charges against Defendants.  Because Plaintiff has not cited any legal authority supporting these claims for relief, the Defendants' Motion is **GRANTED** and these claims are hereby dismissed.

---

[121] *Winbush v. Hilton*, No. CV-07-0194, 2008  WL 5582437 at *18 (W.D. La. June 2, 2008) (citing *Cooks v. Rodenbeck*, 1997-1389 (La.App. 3d Cir. 4/29/98), 711 So.2d 444, 447) (citing *Kyle v. City of New Orleans*, 353 So.2d 969 (La.1977).

### E. Plaintiff's Remaining State Law Claims

Having determined that Plaintiff's federal claims must be dismissed, the Court declines to exercise supplemental jurisdiction over the remaining state law claims.[122] In the Fifth Circuit, the general rule is that when a court dismisses all federal claims before trial, it may dismiss any supplemental claims.[123] Additionally, "the Supreme Court has counseled that the dismissal of all federal claims weighs heavily in favor of declining jurisdiction."[124] "However, the dismissal of the [supplemental] claims should expressly be without prejudice so that the plaintiff may refile his claims in the appropriate state court."[125] Accordingly, in consideration of the interests of judicial economy, fairness to the litigants, and comity, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, and Defendants' Motion to Dismiss Plaintiff's remaining state law claims is **GRANTED**.

## IV. CONCLUSION

For the foregoing reasons, the Defendants' *Motion for Summary Judgment*[126] is **GRANTED IN PART.**

Plaintiff's 42 U.S.C. Section 1983 claims against the City/Parish are hereby **DISMISSED WITH PREJUDICE.**

Plaintiff's 42 U.S.C. Section 1983 first, second, and fourth excessive force claims against the Defendant Officers are hereby **DISMISSED WITH PREJUDICE** on qualified immunity grounds.

---

[122] 28 U.S.C. § 1367(c)(3) ("The district court may decline to exercise supplemental jurisdiction over a claim…if…the district court has dismissed all claims over which it has original jurisdiction.").
[123] See *Bass v. Parkwood Hosp.*, 180 F.3d 234, 246 (5th Cir. 1999).
[124] *McClelland v. Gronwaldt*, 155 F.3d 507, 519 (5th Cir. 1998), (*overruled on other grounds by Arana v. Ochsner Health Plan*, 338 F.3d 433 (5th Cir. 2003)).
[125] *Bass*, 180 F.3d at 246.
[126] Doc. 81.

The Court hereby defers ruling on Plaintiff's third 42 U.S.C. Section 1983 excessive force claims against Defendant Officer Blackwell and the unidentified Defendant Officer because the record is not clear as to when Plaintiff received the video recording of the incident. Plaintiff shall have ten (10) days to file a Supplemental Opposition solely to address this particular claim in light of the video footage.

Plaintiff's state law claim of false arrest and false imprisonment against the Defendant Officers is hereby **DISMISSED WITH PREJUDICE**.

Plaintiff's claims seeking disciplinary action and/or criminal charges be imposed against the Defendant Officers are hereby **DISMISSED WITH PREJUDICE**.

Plaintiff's remaining state law claims are hereby **DISMISSED WITHOUT PREJUDICE**.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana, on June 21, 2018.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**